Filed 4/14/25  P. v. Arteaga CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E084038 |
| v. | (Super.Ct.No. BAF1900449) |
| LAUREANO ARTEAGA, JR., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Timothy F. Freer, Judge. Affirmed.

Johanna Pirko, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

1

## I.

## INTRODUCTION

A jury found defendant and appellant Laureano Arteaga, Jr., guilty of first degree murder (Pen. Code,[1] § 187, subd. (a)). The jury also found true that defendant personally and intentionally discharged a firearm causing great bodily injury and death (§ 12022.53, subd. (d)). Defendant was sentenced to an aggregate term of 50 years to life. Defendant appeals from the judgment. Appointed counsel has filed a brief under the authority of *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*), requesting this court to conduct an independent review of the record to determine whether there are any arguable issues on appeal. In addition, defendant has had an opportunity to file a supplemental brief with this court and has not done so. After independently reviewing the record, we find no arguable error that would result in a disposition more favorable to defendant and affirm.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

M.U. testified he and victim S.R. were close friends. On the night of Wednesday, April 10, 2019, he and his friends, including defendant (who he referred to as "Louie") were hanging out at F.M.'s house. M.U. believed it was on the same date that defendant was "released from prison."[2] M.U. remembered defendant wearing a necklace that night.

---

[1] All future statutory references are to the Penal Code unless otherwise stated.

[2] After M.U. provided this testimony without defense objection, the prosecutor stopped him from testifying further about the subject of having been released from prison.

The necklace "was like a rosary necklace, but [it] had a scorpion on it." The necklace was beaded but M.U. did not recall if it had a cross on it. When shown the necklace found at the scene of the shooting, M.U. identified it as the necklace defendant was wearing that night.

While at F.M.'s house, defendant and S.R. were rapping and they were all drinking. M.U. did not believe anyone was acting out of the ordinary, and he did not witness any disagreement between S.R. and defendant. Although M.U. was drinking that night, he did not believe it affected his perception. While hanging out, defendant retrieved a semiautomatic gun from his waistband and showed it around to the group. The gun had a laser attachment, and M.U. testified he believed it had a magazine in it. M.U. took the gun from defendant and handed it to F.M., then gave it back to defendant. M.U. did not see anyone else at the gathering with a weapon and, to his knowledge, S.R. did not own a weapon.

At trial, M.U. testified that he did not remember hearing defendant tell F.M. not to touch the bullets in the gun. The prosecutor attempted to refresh M.U.'s recollection with his testimony at the preliminary hearing that he remembered defendant making this statement.[3]

---

[3] In the jury's presence, the trial court took judicial notice of the fact that M.U. was asked at the preliminary hearing, "'[D]o you remember the defendant telling [F.M.] not to touch the bullets?'" to which M.U. responded, "'Correct.'" The court later explained, "[i]n this case it has to do with a question and answer from a prior preliminary hearing. And so the Court is taking judicial notice that that was a question, and there was an answer given. Okay? So I've deemed that it is admissible." The prosecutor then repeated the question asked of M.U. at the preliminary hearing and his response. The

*[footnote continued on next page]*

When M.U. took the gun back from F.M. and handed it to defendant, defendant placed the gun in the front of his waistband. Defendant said he needed a ride home and asked the others present for a ride. S.R. offered to take defendant home because defendant's home was on his way to see the girl he planned on visiting. M.U. saw defendant and S.R. leave in S.R.'s BMW with S.R. in the driver's seat. M.U. was not sure where in the car defendant sat. M.U. never saw the gun again after defendant and S.R. left.

Because the trial court found F.M. to be unavailable for trial, F.M.'s preliminary hearing testimony was readback for the jury.[4] F.M. testified at the preliminary hearing that both defendant and S.R. were his friends. On the night of April 10, 2019, his friends "came over, and [they] had a good time." Present were M.U., S.R., defendant, F.M., and F.M.'s brother. They all spent an hour or two together at the house drinking, listening to

court then stated, "So I'm taking judicial notice that that event took place and that you can consider it. There's been some things that have come out that are not—you can't consider. On that particular item, you can consider that." In response to a juror asking what "judicial notice" is, the court responded in part, "In this case it would be . . . something like getting something into evidence that [] we have a record of, but there's not a good way to present it. So the judge is taking judicial notice that that is a part of that testimony or something. Or that Sacramento is the capitol of California. I can take judicial notice that Sacramento is the capitol of California without having to bring the governor in. . . ."

[4] The trial court granted the People's motion to permit the prosecutor to present witness F.M.'s preliminary hearing testimony in lieu of his trial testimony because F.M. was "unavailable." In support of this motion, the prosecutor represented that F.M. was—at the time the prosecution investigator attempted to "serve and secure" his presence—out of the country. The court concluded that the People had exercised "due diligence" in attempting to secure F.M.'s presence. The court instructed the jury that "[t]he testimony that [F.M.] has given under oath was read to you because he is not available. You must evaluate this testimony by the same standards that you apply to a witness who testified here in court."

4

music, and rapping.  There was no dispute between defendant and S.R. and no one was upset.  Everyone present was drinking.

F.M. also testified at the preliminary hearing that defendant was wearing a "God necklace.  The ones that have God, . . . like a rosary."  He thought the necklace had a cross on it and a Jesus on the cross.  He recalled that there was a scorpion on the necklace.  When interviewed by the police, F.M. told them the necklace defendant was wearing "was a gold-colored necklace with a scorpion and a Jesus piece."  Shown a picture of the necklace recovered from the crime scene, F.M. testified that he did not recognize the necklace and that it was not the necklace defendant was wearing on April 10, 2019.

F.M. explained the defendant had a "normal gun," which had bullets in it.  F.M. handled the gun and informed the officers that the gun was a .45 caliber as defendant had told him this information.  F.M. also testified that defendant told him not to touch the bullets, and he did not recall if he had done so.  F.M. told law enforcement that defendant and S.R. left his house at approximately 10:45 p.m. in S.R.'s white BMW.  No one else was with them.  S.R. informed F.M. that he was going to give defendant a ride home.

Banning Police Officer Daniel Deusenberry testified that at 11:06 p.m. on April 10, 2019, he was dispatched to Fourth and George Street where he observed a four-door white BMW that appeared to have collided with a chain-link fence next to a church.  Officer Deusenberry observed what appeared to be a bullet hole through the driver's side window.  Officer Deusenberry believed all the car doors were shut.  However, the parties

5

stipulated that a neighbor, who heard a "loud bang" outside his house around 11:00 p.m. and went outside to see what happened, observed the crashed BMW with S.R. slumped in the driver's seat and the passenger door open with no passenger in the car.

Officer Deusenberry discovered S.R. slumped in the driver's side seat and no passengers in the car. S.R. still had his seat belt on. Officer Deusenberry observed a wound to S.R.'s head and a lot of blood. He declared S.R. dead. On the passenger side floorboard, Officer Deusenberry found a spent shell casing that he opined would have been expelled from a semiautomatic firearm. He located an additional spent shell casing outside of the car. Officer Deusenberry explained that typically a shell casing would be ejected out of the right side of a firearm when it is shot but that there are some variations depending on the type of gun. He did not examine the casings, but waited for detectives to arrive. He did not find any firearms at the scene.

Banning Police Officer Francisco Nieto arrived at the scene within seconds of Officer Deusenberry. The BMW was still running at the time he arrived. Officer Nieto followed a K-9 handler using a bloodhound, but did not discover anything of evidentiary value.

Banning Police Detective Derek Thesier arrived at the scene after it had been secured by other officers. Near a mailbox close to the BMW, he observed the bullet casing that had some blood droplets near it, as well as blood droplets on the mailbox post. When the forensic team arrived at the scene, they informed Detective Thesier that the casing outside the car was a .9-millimeter casing. A necklace was also found near the

6

BMW. The necklace was located from where the BMW had crashed. The necklace had "several beads on it, a . . . crucifix, and a scorpion medallion of some sort." Detective Thesier reviewed video footage that had been taped by the surveillance cameras at the nearby church. Two of the cameras captured footage from just before the BMW collided into the fence outside the church. Although the footage was "grainy," it showed that, at 10:52 p.m., the BMW was moving slowly southbound and "veering towards the church." Detective Thesier testified that the video appeared to show "a pixelated obstruction change in the region near the passenger door area where there's a blur." According to Thesier, it "[a]lmost seem[ed] to be like someone [] jumping out of the passenger's side of the vehicle and maybe tumbling." The figure appeared to jump to "the area of where [the] scorpion necklace was found." This figure then seemed to "recover[]" and run southbound.

Banning Police Corporal Linda Jimenez assisted with the investigation. She reviewed the "grainy" footage from the church surveillance cameras and could see "the figure of a person rolling out of the passenger's side of the white BMW." It appeared the person left "in the direction of northbound Fourth" toward the "house that[] [is] the church office." Asked when in the video she could see the person rolling from the car, she testified that it was as the car was moving forward, but that "[t]his is a very horrible image, and you would have to replay and replay the video in order to see it, but you're not going to be able to see it on this one because it's just really bad quality." In the

course of her investigation, Corporal Jimenez took a buccal swab of defendant's mouth, which she submitted to the Department of Justice.

Retired Banning Police Sergeant Michael Bennett arrived at the crime scene shortly after midnight and did a walk-through. There was blood splatter throughout the car but no blood on the passenger seat. This indicated to him that there had been a person sitting in the passenger seat at the time of the shooting. On the driver's side floorboard, officers found an "actual projectile." The two shell casings found at the scene were from .9-millimeter Luger bullets. The difference between a .9-millimeter gun and a .40 caliber gun is the size of the bullet. A .40 caliber bullet is much larger than a .9-millimeter bullet, and a .40 caliber gun cannot, theoretically, shoot a .9-millimeter bullet. DNA could not be collected off the two shell casings found at the scene.

In addition to the blood in the car, Sergeant Bennett observed blood along the "curb edge [] of Fourth Street" and on the mailbox post. He also observed spots of blood on the outside of the passenger side doorjamb. Sergeant Bennett and his team had watched the church surveillance video "about 90 times." According to Sergeant Bennett, this footage showed that, as the BMW came through the intersection of Fourth Street and George and veered into the southbound lane, "a person roll[ed] out of the vehicle and [took] off running down the roadway southbound." Sergeant Bennett explained that if a person instructed others not to touch the bullets in a gun while looking at the gun, it would indicate the person did not "want to leave trace evidence or maybe a fingerprint on the shell casing of the bullet." However, he agreed there could also be "reasonable"

8

"benign reasons" for such an instruction like not wanting anyone to "extract[] ammunition out of the well." During his investigation, Sergeant Bennett discovered that defendant's date of birth was November 4, 2000, and that he was, therefore, a Scorpio. The Scorpio astrological sign is symbolized by a scorpion.

A week after S.R.'s killing, officers executed a search warrant at defendant's home. During the search, they found defendant's cell phone and two gun holsters. They did not locate a scorpion necklace nor any guns. The parties stipulated that defendant admitted the cell phone belonged to him, and that a Cellebrite download of the phone was accurately performed with the results of the download given to the Banning Police Department. In the downloaded contents of the phone, officers discovered a photograph of defendant pointing a handgun into the mirror. To the left of the photograph, the word "Wednesday" was written.[5] This photo was created or accessed or modified on April 11, 2019. Sergeant Bennett could not opine on what caliber of gun defendant held in the photograph, but could tell that the gun was a Smith & Wesson semiautomatic. S.R.'s iPhone was found in the driver's seat of the BMW and the parties stipulated that the Cellebrite download of the phone was accurate and that the results of the download were given to the Banning Police Department. Based on the download, which showed GPS coordinates, Sergeant Bennett determined the phone moved between 10:56 p.m. and 10:58 p.m. on April 10, 2019 from F.M.'s house to George and Fourth streets where the

_____

[5] The April 10, 2019 shooting occurred on a Wednesday.

9

BMW ultimately collided with the church fence.  Defendant lived on Williams Street about half a mile from the scene of the collision.

After a criminalist had collected DNA swabs from S.R., defendant, the BMW, and the necklace, criminalist Chad Everly analyzed the DNA data.  The blood samples from the doorjamb of the passenger side door of the BMW and the inside right door frame all matched S.R.'s DNA profile with defendant excluded as a contributor.  Analyzing the DNA collected from the necklace, Everly concluded that there were at least two contributors to the DNA.  Both defendant and S.R. were excluded as "major" DNA contributors, but defendant was included as a possible "minor" contributor.  Everly concluded that the "major" DNA contributor was a female.

Forensic Pathologist Dr. Louis Pena performed the autopsy of S.R.  He observed two entrance gunshot wound injuries on the right side of S.R.'s scalp at the temple.  There were two bullet exit wounds on the left side of S.R.'s head—one on the left temple and one below the left side of the jaw.  There was stippling around the wounds.  Stippling is caused when the weapon is more than six or eight inches from the skin and it is caused by "burnt and unburnt gunpowder [] speckling the skin."  Dr. Pena could not definitively conclude on how far S.R. was from the gun muzzle when the gun was fired, but made a "rough estimate" that the muzzle was less than a foot from S.R.  Dr. Pena determined the cause of death was "multiple gunshot wounds of the head" and that S.R. would have died within one second.

10

On November 15, 2019, an information was filed charging defendant with murder (§ 187, subd. (a)). The information also alleged that defendant personally and intentionally discharged a firearm causing great bodily injury and death (§ 12022.53, subd. (d)).

On February 26, 2021, the trial court heard and denied defendant's *Marsden*[6] motion.

On May 25, 2022, defendant's motion to proceed in pro per was heard and granted.

On October 5, 2022, defendant decided he wanted counsel, and the court appointed counsel for him.

On March 7, 2024, the court granted the People's motion to permit the prosecutor to present witness F.M.'s preliminary hearing testimony in lieu of his trial testimony because F.M. was "unavailable." The People represented that F.M. was—at the time the prosecution investigator attempted to "serve and secure" his presence—out of the country. The court concluded that the People had exercised "due diligence" in attempting to secure F.M.'s presence.

On March 8, 2024, the trial court ordered that defendant wear a "Band-it [security] device" on his leg during trial. In summarizing this order, the court explained that the parties and court security personnel had met and that "it was brought to [the court's] attention that there was some concern about the defendant acting out. . . ." Defense

---

[6] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

counsel indicated he did not object to the device as long as it was "not visible at all and obviously it's not going to be turned on or whatever, used unless it's an emergency . . . . I don't think it prejudices his position at all." The court indicated that, if defendant wanted to testify, the court would assure he walked to the stand without the jury present.

On March 12, 2024, the parties stipulated that defendant "was residing in a youth facility from Friday, August 31st, 2018, at approximately 8:00 p.m. to Wednesday, April 10, 2019, at approximately 11:00 a.m."

On March 18, 2024, the jury found defendant guilty of first degree murder and found true the firearm enhancement.

On May 31, 2024, the trial court sentenced defendant to a total term of 50 years to life: 25 years to life for the murder conviction, plus a consecutive term of 25 years to life for the section 12022.53, subdivision (d) firearm enhancement. The court explicitly recognized that it had discretion to strike or reduce the section 12022.53, subdivision (d) firearm enhancement but declined to exercise this discretion. Defendant timely appealed.

III.

DISCUSSION

After defendant appealed, upon his request, this court appointed counsel to represent him. Upon examination of the record, counsel has filed a brief under the authority of *Wende*, *supra*, 25 Cal.3d 436 and *Anders v. California* (1967) 386 U.S. 738 (*Anders*), setting forth a statement of the case, a summary of the facts and potential arguable issues and requesting this court to conduct an independent review of the record.

12

Counsel has identified six potential issues: (1) whether defendant's trial counsel render ineffective assistance of counsel by stipulating defendant was released from a "'juvenile facility'" on the morning of the crime given that a prosecution witness briefly testified the crime occurred on the morning defendant was "'released from prison'" and the prosecutor briefly mentioned defendant's juvenile detention once in closing argument; (2) whether the trial court abused its discretion in admitting a photograph from defendant's cell phone from the day after the murder where defendant was pointing a gun in the mirror and the word Wednesday (the day on which the murder occurred) appears; (3) whether the court abused its discretion in allowing the People to present F.M.'s preliminary hearing testimony based on the conclusion that F.M. was "'unavailable'" for trial because he was purportedly out of the country; (4) whether the court prejudicially abused its discretion in admitting, and taking judicial notice (before the jury) of M.U.'s preliminary hearing testimony that he heard defendant telling F.M. not to touch the bullets; (5) whether the court correctly overruled the defense objection to Officer Jimenez's "'description of the video'" exhibit that Sergeant Bennett testified his team watched approximately 90 times and which appeared to show a person rolling out of the passenger seat and running away after the car crashed; and (6) whether there was substantial evidence of deliberation and premeditation to support the first degree murder conviction.

We offered defendant an opportunity to file a personal supplemental brief, but he has not done so.

13

An appellate court conducts a review of the entire record to determine whether the record reveals any issues which, if resolved favorably to defendant, would result in reversal or modification of the judgment. (*Wende*, *supra*, 25 Cal.3d at pp. 441-442; *People v. Feggans* (1967) 67 Cal.2d 444, 447-448; *Anders*, *supra*, 386 U.S. at p. 744; see *People v. Johnson* (1981) 123 Cal.App.3d 106, 109-112.)

Pursuant to the mandate of *People v. Kelly* (2006) 40 Cal.4th 106, we have independently reviewed the entire record for potential error and find no arguable error that would result in a disposition more favorable to defendant.

IV.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:


McKINSTER
Acting P. J.


FIELDS
J.